USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6/19/15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
WARREN HERSHKOWITZ,                               :
                                                   :
                         Plaintiff,                :
                                                   :      **FINDINGS OF FACT &**
            -against-                              :      **CONCLUSIONS OF LAW**
                                                   :
THINK TECH LABS, LLC and                          :
VIJAY MEHRA, In His Individual Capacity           :      13 Civ. 5564 (RMB)
and In His Capacity as CEO of Think Tech          :
Labs,                                              :
                                                   :
                         Defendants.               :
-------------------------------------------------------------X

## I.     Background

On June 5, 2013, Plaintiff Warren Hershkowitz ("Plaintiff" or "Hershkowitz"), a real

estate marketing professional and founder of a real estate consulting firm, filed a complaint

against Think Tech Labs, LLC ("Think Tech"), a software company, and Think Tech's founder

and Chief Executive Officer, Vijay Mehra ("Mehra" and, collectively, "Defendants").[1]  (Compl.,

dated June 5, 2013, at 1.)  The Complaint alleges that Defendants "actively employ[ed]"

Hershkowitz from November 2012 until April 2013 but "failed to perform their obligations

under the terms of the employment agreement that was negotiated and entered into by the

parties." (Id. ¶¶ 1–2.)  According to the Complaint, "[p]ursuant to the terms of the [employment]

Agreement, Plaintiff is owed more than $37,000 in commissions from deals that Plaintiff already

has closed on behalf of Defendants, for which Plaintiff has not been paid" and "[t]he Agreement

further requires Defendants to pay Plaintiff a commission on [Think Tech's October 2013

---

[1] Plaintiff initially filed his complaint in the Supreme Court of the State of New York, County of
New York.  On August 9, 2013, Defendants removed the action to this Court.  (See, Notice of
Removal, dated Aug. 9, 2013.)

licensing deal with Keller Williams Realty, Inc. ("Keller Williams")] of fifteen percent (15%)" or $6,981,579.68. (Id. ¶ 37; (see Pl.'s Proposed Findings of Fact and Conclusions of Law, dated Dec. 15, 2014 ("Pl. FFCL"), at 19.) Plaintiff brings common law claims of breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, and quantum meruit. He also asserts violations of the minimum wage and overtime provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq. and New York Labor Law, ("NYLL") §§ 191 et seq., and violations of the commissions-payment and wage statement provisions of the New York Labor law, NYLL §§ 191(1)(c) & 195.[2] Plaintiff is seeking a total of $7,013,893.61 in unpaid commissions and $15,322 in unpaid wages. (See Pl. FFCL at 19–20.)

On August 16, 2013, Defendants filed their Answer to the Complaint, which included a counterclaim against Plaintiff for tortious interference with prospective business relations. (See Answer, dated Aug. 16, 2013, ¶¶ 42–47.) In their counterclaim, Defendants allege that "when it became clear [in April 2013] that the relationship between Hershkowitz and [Think Tech] was fractured, Hershkowitz (and others on his behalf) began to contact existing and prospective customers of [Think Tech]" and "expressed negative opinions of [Think Tech] and/or sought to cast a negative light on [Think Tech] and Mehra." (Id. ¶¶ 26 –28.). Defendants seek damages in the amount of $57,587. (Defs.' Proposed Findings of Fact and Conclusions of Law, dated Dec. 15, 2015 ("Defs. FFCL"), at 28.)

---

[2] Prior to trial, Plaintiff "withdr[ew] his fifth cause of action for failure to keep accurate records under the FLSA . . . his twelfth cause of action for promissory estoppel, and his thirteenth cause of action for a declaratory judgment." (Joint Pre-Trial Order, dated September 29, 2014 ("JPTO"), at 18 n.7.)

At a conference on March 24, 2015, the parties elected, following discovery, to forego summary judgment and to proceed directly to a bench trial. (Hr'g Tr., dated Mar. 24, 2015, at 4:16–25.)

The Court held a bench trial on October 29, 2014. (See Trial Tr., dated Oct. 29, 2014 ("Tr.").) Prior to the trial, the parties submitted, among other things, a Joint Pre-Trial Order, dated September 29, 2014 ("JPTO"); Plaintiff's Pre-Trial Memorandum of Law, dated September 29, 2014; and Defendant's Pre-Trial Memorandum of Law, dated September 29, 2014. In lieu of live direct testimony, Plaintiff also submitted his testimony by affidavit. (Decl. of Warren Hershkowitz, dated Sept. 29, 2014 ("Hershkowitz Decl.").) Defendants submitted the direct testimony affidavits of Mehra, Suresh Mehra, who is Mehra's father and a member of Think Tech's advisory board, and Eric Kingston, who is Think Tech's Chief Technology Officer. (See Decl. of Vijay Mehra, dated Sept. 29, 2014, ("Mehra Decl."); Decl. of Suresh Mehra, dated Sept. 29, 2014; Decl of Eric Kingston, dated Sept. 29, 2014).) Jason Tang, a Keller Williams employee who resides in Texas, was unavailable to testify in person and, accordingly, both parties submitted deposition designations of his testimony. (Ex. 1 to the Decl. of David C. Gartenberg in Support of Defs.' Submission of Designations from the Deposition of Jason Tang, dated Oct. 17, 2014 ("Tang Dep.").)

At the trial, the Court had an excellent opportunity to observe witness demeanor and assess witness credibility during cross examination and re-direct examination.

On December 15, 2014, Plaintiff filed his Proposed Findings of Fact and Conclusions of Law. (Pl. FFCL at 1.) Plaintiff contends that the record establishes, among other things, that (1) a "December 14, 2012 G-chat [conversation between Plaintiff and Mehra] was an employment contract between Defendants and Plaintiff" and "Defendants breached the contract by not

3

compensating Plaintiff" according to the terms of that contract; [3] (2) "Even if the [December 14, 2012 G-Chat] did not cover Plaintiff's entitlement to all the commissions he seeks, he is entitled to be paid 15% in commission on such deals" under theories of unjust enrichment and quantum meruit because "[a]llowing Defendants to profit from Plaintiff's substantial time and efforts without adequately compensating him would be unjust"; (3) "[b]ecause [he] was an employee of Defendants, under the FLSA [and the NYLL], Plaintiff is entitled to minimum wage [and overtime] for the hours he worked for Defendants" and is also entitled to "commissions and expenses owed to him as a commissioned employee salesperson pursuant to NYLL § 19[1]"; and (4) Defendants' tortious interference counterclaim should be dismissed because "[t]he letters referenced by Defendants are nothing more than routine litigation hold letters" and "do not evince any improper motive." (Id. at 21, 25, 28; Mem. of Law in Supp. of Pl.'s Mot. in Limine to Strike Defendants' Tortious Interference Counterclaim, dated Sept. 29, 2014, at 12.)

Also, on December 15, 2014, Defendants filed their Proposed Findings of Fact and Conclusions of Law. (Defs.' Proposed Findings of Fact and Conclusions of Law, dated Dec. 15, 2015 ("Defs. FFCL").) Defendants contend that the record establishes, among other things, that (1) "Plaintiff's breach of contract claim—which seeks commissions on the [Keller Williams] Deal and other deals based on the [December 14, 2012] G-Chat Conversation—is barred by New York's Statute of Frauds"; (2) Hershkowitz's unjust enrichment and quantum meruit claims fail because "Hershkowitz failed to submit admissible evidence of the reasonable value of his purported services to Think Tech"; (3) Plaintiff was not an "employee" under either the FLSA or

---

[3] The term "G-Chat" refers to "Google Chat," an instant messaging service provided by Google by which individuals "can send and receive instant messages with anyone." ("About Google Chat," found at https://support. google.com/chat/answer/159495?hl=en (accessed June 12, 2014).)

NYLL and "even if Hershkowitz had been an employee under the FLSA and NYLL, he was exempt from the [statutory] requirements because he functioned as an 'outside salesman'"; and (4) "[a]fter leaving Think Tech, Hershkowitz tortiously interfered with a number of Defendants' business relationships, causing them to (i) lose business it otherwise would have gained, and (ii) make concessions to close new deals or retain existing contracts." (Id. at 19, 21–22, 25–26, 28.)

**For the reasons stated below, the Court concludes that Plaintiff bas failed to prove his claims by a preponderance of the evidence, and that Defendants have failed to prove their counterclaim by a preponderance of the evidence.[4]**

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court's Findings of Fact and Conclusions of Law follow.

## II.    Findings of Fact

1.    Think Tech, a Delaware corporation based in Texas, owns and markets a software product called REthink CRM, which assists real estate brokerages in managing their client relationships. (Mehra Decl. ¶ 2). As noted, Mehra is Think Tech's founder and Chief Executive Officer. (Id.)

2.    Beginning in June 2010, Plaintiff developed a business relationship with Defendants through Plaintiff's real estate consulting company, Square Foot Advisors, LLC, which is based in New York. (Hershkowitz Decl. ¶ 3.) Pursuant to this relationship, Think Tech entered into a handful of small contracts with customers introduced by Hershkowitz, for which Square Foot Advisors was paid a consulting fee, (Mehra Decl. ¶ 5), and Plaintiff "leverage[d] REthink as a means to solicit real estate companies for SFA." (Id. ¶ 4.)

---

**[4] Any issues raised by the parties not specifically addressed herein were considered by the Court on the merits and rejected.**

5

3.     In late October or early November 2012, a representative of Keller Williams, a large residential and commercial real estate company headquartered in Austin, Texas, contacted Mehra to discuss a possible multi-million dollar transaction in which Keller Williams would "licens[e] [Think Tech's] Rethink [software] application to replace aspects of its real estate business's legacy technology system." (Statement of Undisputed Facts (Section V. of JPTO) ("SOUF"), at ¶ 10; (Mehra Decl. ¶ 8).) Plaintiff played no role ("whatsoever") in soliciting or introducing Keller Williams to Think Tech or to Mehra. (Mehra Decl. ¶ 7.)

4.     On November 1, after Keller Williams had made contact with Mehra, Mehra contacted Plaintiff via G-Chat conversation and asked whether Plaintiff had "any contacts at [K]eller [W]illiams corporate," to which Plaintiff responded "yes." (Pl. Ex. 1 (G-Chat between Mehra and Plaintiff, dated Nov. 1, 2012).) Mehra stated that "we're in the door already" but "need some reinforcing." Mehra also told Plaintiff that "this deal just trumped [H]alstead by 10x . . . could bring you in for sure," and "we should bring you in on the sales/demo call." (Id.) During the November 1 G-Chat conversation, Plaintiff stated: "I know [Keller Williams's] buttons . . . and their lingo. That will be a big advantage." Mehra responded: "perfect . . . consider yourself in the deal then." (Id.) On November 14 and 15, 2012, Mehra met with Keller Williams and described to Keller Williams how it could use REthink to benefit its business. (Mehra Decl. ¶ 13.) Plaintiff also attended this meeting but had a minimal role in the presentation. (Tr. 106:1–2.)

5.     On December 14, 2012, Mehra and Hershkowitz had another G-Chat conversation in which they discussed a 15% commission for "one-off" licensing deals that Plaintiff "closed" on behalf of Think Tech:

    **[Mehra]**: what do you think we should be doing with [sic] one-offs? leads that is

6

**[Plaintiff]**: i've been following up with them all – four so far. Do you have someone who can handle it? otherwise, I'll just close them

**[Mehra]**: we don't have anyone right now close them and I'll throw you commission. 15% for everything you close during this limbo period.

**[Plaintiff]**: ok.

(SOUF ¶ 11; Pl. Ex. 15 (G-Chat between Mehra and Plaintiff, dated Dec. 14, 2012).)

6.     Soon after the December 14, 2012 G-Chat, Mehra began introducing Plaintiff to prospective Think Tech customers as Think Tech's "VP of Sales" and directed them to speak with Plaintiff about Think Tech's products and services. (See Pl. Exs. 16, 17, 18.)

7.     From December 14, 2012 until the termination of Plaintiff and Defendants' business relationship in early April 2013, Plaintiff spent most of his working time on Think Tech-related projects, including the Keller Williams deal. (See Ex. A to Hershkowitz Decl. (listing "hours Plaintiff worked for [Think Tech]").) During this time period, Plaintiff engaged in the following tasks on behalf of Think Tech: (1) "pursuing leads through numerous calls, correspondence, and meetings," (2) "managing [Think Tech's] sales force," and (3) drafting and negotiating a Letter of Intent between Keller Williams and Think Tech which was executed on February 6, 2013. (Hershkowitz Decl. ¶¶ 19, 22, 23, 30, 41.)

8.     During the December 2012-April 2013 time period, Mehra "did not control or otherwise monitor Hershkowitz's schedule." (Mehra Decl. ¶ 38.) Hershkowitz continued to run his own company, Square Foot Advisors, throughout the December 2012-April 2013 time period. (Pl. Ex. 22 (G-Chat between Mehra and Plaintiff, dated Jan. 7, 2013) ("[Plaintiff]: We haven't finalized a deal together, and until that happens, I've got to keep on working on [SFA] business"); Tr. at 28:21–29:10 ("Q: And as late as March 2013, you were still doing deals for

7

your own company, right? . . . [Plaintiff]: Yes."); Def. Ex. 70 (Square Foot Advisors had $355,000 in sales from October 2012-December 2013)). During this time period, Hershkowitz neither dissolved Square Foot Advisors, (Tr. at 29:16–22), nor gave up its New York office space. (Tr. 29:25–30:1.) And, Hershkowitz did not terminate Square Foot Advisors' employee. (Tr. at 36:25–37:17 ("[Plaintiff]: [Square Foot Advisors] had one employee . . . throughout 2012 and . . . through maybe mid-2013").)

9.      Notwithstanding his work on behalf of Think Tech, Hershkowitz worked in Square Foot Advisors's offices in New York. He did not work in Think Tech's Texas offices. (Tr. at 30:5–18; Mehra Decl. ¶ 17.)

10.     For his work for Think Tech, Plaintiff was paid as an independent contractor rather than as an employee. On cross-examination, Plaintiff acknowledged that "every dime that [he] w[as] paid by Think Tech [was] paid as a 1099 independent contractor." (Tr. 20:6–9.)

11.     On March 16, 2013, Defendants sent Hershkowitz a check in the amount of $7,959.29, which represented 15% in commissions for several deals closed by Plaintiff up to that date, namely Big State Home Buyers, CBRE-Hurley, Novak Forney, Cushman & Wakefield-Briner, SFA, Cruse Real Estate, The Mouchet & Mitchell Group of Judge Realty, Colliers International NC, Elliman, Meridian Pacific Properties, Las Vegas Quality Homes, and DC Real Estate, and CBRE-Hurley. (See Pl. Exs. 73–74; SOUF ¶ 13.) Also, on March 16, 2013, Defendants reimbursed Plaintiff the amount of $892.22 for expenses (per an expense report) submitted to Think Tech by Plaintiff. (Pl. Ex. 71; SOUF ¶ 14.) These two payments (totaling $8,851.51) were the only payments Plaintiff received for work Plaintiff did for Think Tech. (SOUF ¶ 15.) At trial, Plaintiff acknowledged that these payments did not constitute a "payroll

8

check" and that he never received a payroll check. (Tr. at 63:25–64:1 ("Q: Did you ever get a check? [Plaintiff]: Payroll check? No.").)

12.     Think Tech did not withhold payroll taxes from the March 16, 2013 commissions check. (Tr. at 69:22–23 ("The Court: Any withholding from that [March 2013 check]? [Plaintiff]: No.").) Hershkowitz also acknowledged that he never received any employee benefits, such as medical benefits or stock options, from Think Tech. (Tr. at 5:22–25 ("Q: Did you receive any medical benefits or a medical plan? [Plaintiff]: No. Q: Were you ever on a dental plan? [Plaintiff]: No. Q: Did you ever receive any stock options? [Plaintiff]: No.").)

13.     Although he asserts that the December 14, 2012 G-Chat constituted a binding employment agreement, Plaintiff expressed to Mehra on several occasions after December 14, 2012 a desire to "finalize my deal." (Def. Ex. 4 (G-Chat between Mehra and Pl., dated Feb. 4, 2013); Def. Ex. 1 (Email from Pl. to Mehra, dated Jan. 16, 2013) ("I think now is the right time to piece together the offer for me to join as VP Sales. We should have this ironed out so I know what the total situation looks like.").) Plaintiff also stated to Mehra on January 16, 2013 that "[w]e haven't finalized a deal together." (Pl. Ex. 22.)

14.     Beginning on March 1, 2013, Hershkowitz and Mehra negotiated and exchanged draft offer letters which described the proposed material terms of Plaintiff's relationship with Think Tech, including job title, responsibilities, and compensation. However, the parties never reached an understanding or an agreement on the terms outlined in these drafts. (Tr. at 39:3–5 ("[The Court]: You hadn't been able to work out a deal at this point [by April 6, 2013], right? [Plaintiff]: Correct.").) Indeed, Hershkowitz and Mehra never agreed on the terms of an offer letter. Nor did they ever execute any employment agreement. (Tr. at 14:11–13 ("[The Court]:

9

So even as of the last draft, there was still more to do?" [Plaintiff]: "Correct."); id. at 32:3–4 ("Q: Was any agreement along these lines ever signed? [Plaintiff]: No.").)

15.     None of the draft offer letters exchanged by Plaintiff and Mehra during the March 1, 2013-April 5, 2013 time period provides for a 15% commission in connection with the Keller Williams deal. (See Def. Exs. 13, 17, 27.) In fact, none of the draft offer letters exchanged proposed more than a 2.5% commission for the Keller Williams deal. (Id.)

16.     Throughout their negotiations over Plaintiff's relationship with Think Tech, Plaintiff and Mehra used varying and conflicting descriptions of Plaintiff's employment status. For example, on February 22, 2013, Hershkowitz sent an email to Mehra attaching a document titled "Square Foot Advisors Company Transition and Phase Out," which included Hershkowitz's comments that: "Warren [Hershkowitz] will be brought on board as a 1099 [independent contractor] for a period of 3 months. [Think Tech] and [Hershkowitz] will assess the viability of transitioning to a W-2 employee on or after June 1, 2013." (Def. Ex. 12.) The initial draft offer letter that Mehra sent to Hershkowitz on March 1, 2013 states "this agreement does not constitute a full time or part time employment [sic]" and refers to Plaintiff's proposed position as "Independent Sales Person." (Def. Ex. 13). The next two draft offer letters exchanged between the parties—on March 2 and 15, 2013, respectively—refer to Plaintiff as an "employee" but also state that Hershkowitz's "position is exempt from overtime pay." (Def. Exs. 17, 27). In a March 17, 2013 email to Plaintiff, Mehra stated: "At this point, you are considered a full-time employee of Think-Tech Labs . . . ." (Pl. Ex. 57.) However, on April 9, 2013, Hershkowitz's counsel, Joseph Piesco, sent Mehra an eight-page draft "Consulting Agreement" which stated that Hershkowitz "shall at all times be an independent contractor to [Think Tech] and not a[n] . . . employee." (Def. Ex. 80.)

10

17. The parties have stipulated that "[o]n the morning of April 5, 2013, any relationship between Plaintiff and Think Tech came to an end." (SOUF ¶ 16.) Notwithstanding their stipulation, the parties disagree over how, why, and when the relationship ended. According to Plaintiff, Defendants fired him by cutting off Plaintiff's access to his Think Tech email account and Think Tech's "project management system." (Tr. at 47:4–8 ("The Court: And what were the incidents or indicia of you being fired? One was you didn't get return emails. [Plaintiff]: I was cut off from the company in terms of getting email communications to do my job . . . I couldn't log onto the [project management] system.").) Hershkowitz also stated that the cutting off of his access to email and to Think Tech's project management system did not occur until "Monday or Tuesday [April 8 or 9]." (Tr. at 48:4–49:4.) At trial, Plaintiff acknowledged that no one at Think Tech told him he was fired. (Tr. at 48:24–49:1 ("The Court: Did anybody say, any of the defendants, you're out, you're fired? [Plaintiff]: No.").)

18. According to Mehra, the relationship between the parties began to deteriorate after a conversation between Mehra and Hershkowitz on April 5, 2013, during which Plaintiff told Mehra that "I want to focus all my efforts on Square Foot Advisors, just go ahead and pay me commissions on the Keller Williams deal." (Tr. 145:4.). Subsequently, as noted, on April 9, 2013, Hershkowitz's attorney sent Defendants a draft "Consulting Agreement," which—for the first time—provided that Hershkowitz would receive a commission of "15% of the gross revenue of any deals initiated or consummated by [Plaintiff], or on which [Plaintiff] participates or works . . . including the purchase of licenses by Keller Williams." (Def. Ex. 80.) Counsel's letter to Defendants—which said nothing about Plaintiff's alleged termination—stated as follows:

11

In light of the disagreements existing between the parties . . . and our clients' ongoing concerns regarding you and Think Tech's failure to pay compensation previously agreed to, we believe it to be in everyone's best interests to reach a resolution concerning both the payment of compensation currently due to our clients and the compensation to which our clients will be entitled in the event the Keller [Williams] deal is consummated . . . . If an agreement cannot be reached, our clients obviously will have no choice but to disclose to Keller [Williams] that they will not be involved in any potential future relationship between the parties, as well as any other matters necessary in order to protect our clients' rights, entitlements and remedies.

Kindly let us know your response to the proposed Consulting Agreement no later than close of business Thursday, April 11, 2013. If we do not receive a response from you . . . our client immediately shall cease providing further services to you and Think Tech."

19. According to Mehra, upon receiving this letter from Mr. Piesco on April 9, 2013, he "had no desire to continue a relationship with Mr. Hershkowitz . . . . And the relationship dissolved." (Tr. 145: 2–4.)

20. In early May 2013, Plaintiff's attorney sent six letters to Defendants' actual and prospective customers, including to Keller Williams, Fameco Real Estate, Behar Group Realty, and HPI Corporate Services, LLC, which described the dispute between Hershkowitz and Think Tech. (Def. Exs. 43–48.) The letters asserted Defendants' alleged "failure to pay commissions, wages, and/or other remuneration to which [Hershkowitz is] entitled, pursuant to an agreement between Mr. Hershkowitz and Mr. Mehra." (See e.g., Def. Ex. 48 (Letter from J. Piesco to Kate Elliot, dated May 7, 2013). The letters also stated: "We write to request that you search your files and gather any and all Records that relate to . . . Mr. Hershkowitz's role and/or relationship with Think Tech and/or Mr. Mehra." (Id.)

21. At some point after April 5, 2013, Plaintiff called Jason Tang, a senior executive at Keller Williams. (Tang Dep. at 25:5–7.) Tang described the call as "destructive,"

12

"confusing," "unprofessional" and "inappropriate"—a "rant" about Think Tech and Mehra. (Id. at 25:5–7 ("Mr. Hershkowitz had placed a phone call to me indicating that he had parted ways with Think Tech Labs, and he kind of went off on a rant about how he felt like he was owed compensation. It was -- it was a very confusing phone call, and I felt that it was inappropriate."); id. at 81:4–6; id. at 84:18–21.) Plaintiff, on the other hand, testified that "Jason Tang and I had developed a fairly good working relationship" and "I called to wish him good luck. I explained that [Mehra] and I had not seen eye-to-eye on our deal, and that was it." (Tr. at 79:20–80:1.)

22. Plaintiff contends that, pursuant to the December 14, 2012 G-Chat, Defendants owe him approximately $6,981,579.68 in commissions from the Keller Williams deal which, according to Plaintiff, "closed" prior to April 5, 2013. (Pl. FFCL at 2.) Defendants contend that "[w]hen Hershkowitz left [Think Tech], the [Keller Williams] Deal had not closed, nor had its material terms been negotiated or finalized," and, as indicated below, that "the Keller Williams Deal did not close until October 2013." (Defs. FFCL at 6, 16.)

23. At Think Tech, deals were considered "closed" at the time of "the successful execution of a Master License Agreement and Order Form for the REthink CRM service." (Compl. ¶ 20(f); Tr. at 58:20–59:1 ("[Plaintiff]: That's how [closed transaction] was defined.").) At trial, Hershkowitz conceded that the "definitive agreements [for the Keller Williams deal] hadn't been executed yet," i.e., at the time of his alleged termination on April 5, 2013. (Tr. 59:2–7.)

24. The Court finds that the Keller Williams deal did not close until October 2013, when Think Tech and Keller Williams executed a Master Services Agreement, Statement of Work, and Application Licensing Agreement. (Mehra Decl. ¶ 56; SOUF ¶¶ 18–21.) This

13

occurred approximately six months after Hershkowitz's relationship with Think Tech ended on April 5, 2013.

## III.  Conclusions of Law

1.  Plaintiff contends that the December 14, 2012 G-Chat constitutes a binding "employment contract." (Pl. FFCL at 25.) Defendants argue (persuasively) that the alleged employment agreement, i.e., the December 14, 2012 G-Chat, is at most "a service contract of indefinite duration," and that "Plaintiff's breach of contract claim . . . is barred by New York's Statute of Frauds." (Defs. FFCL, at 22–23.)

2.  New York's Statute of Frauds voids and renders unenforceable "[e]very agreement, promise or undertaking" which "[b]y its terms is not to be performed within one year from the making thereof," "unless it [is] in writing, and subscribed [i.e., signed] by the party to be charged therewith." N.Y. Gen. Oblig. Law § 5–701(a)(1). New York's Statute of Frauds also voids and renders unenforceable any unsigned or unwritten agreement "to pay compensation for services rendered in negotiating . . . the purchase, sale, [or] ex-change . . . of a business opportunity . . . ." N.Y. Gen. Oblig. Law § 5–701(a)(10).

3.  The Court concludes that any commitment by Mehra to pay commissions to Plaintiff in the December 14, 2012 G-Chat is unenforceable under the Statute of Frauds, assuming that the G-Chat means what Plaintiff contends it means, i.e., that "Defendants would pay [Hershkowitz] 15% commission on the [Keller Williams] deal, as well as any other licensing and service agreements [he] worked on that ultimately brought in revenues into [Think Tech], regardless of whether [he] was still an employee of [Think Tech] at the time [Think Tech] received such revenues." (Pl. FFCL at 9.). Such an agreement constitutes a promise of perpetual commissions which is incapable of being performed within one year. See Fabri-Com, Inc. v.

14

Tex-Fi Indus., Inc., 265 A.D.2d 206, 208 (N.Y. App. Div. 1999) (where "plaintiff's claim was based on its contention that it was promised perpetual commissions on any of the accounts it had formerly serviced or any products it had 'developed' regardless of whether it continued to service the account"); see also Bonsey v. Kates, 2013 WL 4494678, at *7 ("Where the accrual of commission is dependent upon the will of a third party and not upon the parties to the contract, the oral commission agreement is, by its terms, incapable of completion within one year and barred by the Statue of Frauds." (internal quotation marks omitted)).

4.      Even if, arguendo, the alleged commitment contained in the December 14, 2012 G-Chat were capable of performance within one year (which it is not), the G-Chat would likely be construed as a commitment "to pay compensation for services rendered in negotiating . . . the purchase, sale, [or] exchange . . . of a business opportunity" and, to be enforceable, would have to be in writing and/or signed to comport with Section 5–701(a)(10) of the Statute of Frauds. See Ostrove v. Michaels, 289 A.D.2d 211, 212 (N.Y. App. Div. 2001) ("This provision [N.Y. Gen. Oblig. Law § 5–701(a)(10)] has been held to apply to agreements by brokers for commissions."); Tower Intern., Inc. v. Caledonian Airways, Ltd., 133 F.3d 908 (2d Cir. 1998) ("Tower's alleged agreement to act as a broker for Caledonian in negotiating the transaction had to satisfy the writing requirement of the Statute of Frauds."); Ely v. Perthuis, No. 12 Civ. 1078, 2013 WL 411348, at *3 (S.D.N.Y. Jan. 29, 2013) ("[R]eceiving a commission for assisting in the negotiation and completion of a transaction, including providing the 'know-who' and 'know how,' falls within New York's Statute of Frauds."); Intertex Trading Corp. v. Ixtaccihuatl S.A. de CV, 754 F. Supp. 2d 610, 616 n.3 (S.D.N.Y. 2010) (where "the alleged services provided by Intertex under the Commission Agreement translate into: (i) introducing potential buyers

15

("know-who"); (ii) arranging meetings; and (iii) participating in business negotiations ("know-how"), all in exchange for a commission").

5.    Because the arrangement discussed in the December 14, 2012 G-Chat falls within the Statute of Frauds (as both an agreement incapable of completion within one year and an agreement "to pay compensation for services rendered in negotiating . . . the purchase, sale, [or] exchange . . . of a business opportunity"), it is void and unenforceable unless "(1) it is signed by the party to be charged; (2) it designates the parties; (3) it identifies and describes the subject matter; and (4) it embodies all of the essential terms of a complete agreement." Bellen v. Weiser, No. 05 Civ. 8775, 2007 WL 2979827, at *3 (S.D.N.Y. Oct. 11, 2007). The December 14, 2012 G-Chat fails the first requirement because it does not contain a signature of either Mehra or Plaintiff. See Bayerische Landesbank v. 45 John St. LLC, 102 A.D.3d 587, 587 (N.Y. App. Div. 2013) ("[T]he email relied upon by defendants, which contained a pre-printed signature, was not a sufficient writing under the statute of frauds."); Leist v. Tugendhaft, 64 A.D.3d 687, 687 (N.Y. App. Div. 2009) ("The fact that the listing agent was identified as the sender in the e-mail to which the attachment was made does not satisfy the subscription requirement.").

6.    The G-Chat also fails adequately to "identif[y] and describe[] the subject matter." Weiser, 2007 WL 2979827, at *3. For example, the G-Chat uses the term "one-offs," which purportedly describes the deals for which Plaintiff claims he is entitled to a 15% commission and is ambiguous. It certainly does not mention the Keller Williams deal for which Plaintiff is seeking $6,981,579.68. See Behrends v. White Acre Acquisitions, LLC, 54 A.D.3d 700, 701 (N.Y. App. Div. 2008) (where "[s]everal terms utilized in the contracts, such as, 'stabilized,' 'gross annual income,' and 'expenses' are ambiguous" and noting that "[w]here a contract's

16

material terms are not reasonably definite, the contract is unenforceable."); TR-One, Inc. v. Lazz Development Co., Inc., 95 A.D.3d 1303, 1204 (N.Y. App. Div. 2012) ("[O]n the face of the agreement, it is impossible to identify the subject property with the degree of certainty necessary to satisfy the statute of frauds."); Carruthers v. Flaum, 450 F. Supp. 2d 288, 309 (S.D.N.Y. 2006) ("Thus, I am left with (at best) an ambiguous price term, the most essential element of any contract. Therefore, on its face, the Letter of Intent does not satisfy the Statute of Frauds.")

7.     The G-Chat also fails to "embod[y] all of the essential terms of a complete agreement." Weiser, 2007 WL 2979827, at *3. For example, the G-Chat does not state a definite duration or term of the purported commissions agreement. Rather, the G-Chat states that the purported agreement applies "during this limbo period." Rouzani v. Rapp, 203 A.D.2d 446, 447 (N.Y. App. Div. 1994) ("The April 29, 1988, memorandum does not contain all the essential terms of a commercial lease, such as . . . a definite term . . . ."). As noted, the G-Chat also uses the ambiguous term "one-offs" to describe the transactions covered by the purported agreement. See Springwell Corp. v. Falcon Drilling Co., Inc., 16 F. Supp. 2d 300, 305–06 (S.D.N.Y. 1998) ("[C]ourts have dismissed . . . claims under the Statute of Frauds where the writings . . . left ambiguity as to whether the agreement's terms covered the transaction upon which a fee was claimed.").

8.     The arrangement reflected in the December 14, 2012 G-Chat is unenforceable under the Statute of Frauds and, therefore, Plaintiff has failed to prove his breach of contract claim. Weiser, 2007 WL 2979827, at *3. (See also, Conclusions of Law, supra ¶¶ 3–7.) And, because there is no enforceable contract, Plaintiff has failed to prove his claim of breach of the implied covenant of good faith and fair dealing. See United Magazine Co. v. Murdoch

17

Magazines Distrib., Inc., 146 F. Supp. 2d 385, 405 (S.D.N.Y. 2001) ("A cause of action for breach of this implied covenant . . . is dependent upon the existence of an enforceable contract.")

9. Plaintiff argues (unpersuasively) that "Defendants waived any right to assert a statute of frauds defense by not raising it in their Answer." (Pl. FFCL, at 30.) That is, the United States Court of Appeals for the Second Circuit has held that "[w]aiver may not be proper where the defense is raised at the first pragmatically possible time . . . and would not unfairly prejudice the opposing party." American Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 910 (2d Cir. 1998). And, "Courts excuse the failure to plead affirmative defenses . . . when they find that the purposes of the rule requiring pleading of an affirmative defense—to give notice to the plaintiff and to give her an opportunity to respond—have been met." Foster v. Lee, No. 13 Civ. 5857, 2015 WL 786990, at *5 (S.D.N.Y. Feb. 25, 2015) (citing Curry v. City of Syracuse, 316 F.3d 324, 330–31 (2d Cir. 2003).

10. Plaintiff was on notice of Defendants' position regarding the unenforceability of the December 14, 2012 G-Chat at least as early as January 28, 2014 when, at his deposition, Mehra stated that the G-Chat "wasn't binding . . . without some sort of document or agreement in place." (Dep. of V. Mehra, dated Jan. 28, 2014 (Ex. 2 to Letter from Thomas Dewey to Hon. Richard M. Berman, dated Oct. 2, 2014).) See Hudson River Grp. v. Minute Maid Co., a Div. of Coca-Cola Co., No. 01 Civ. 10559, 2004 WL 829008, at *3 n. 6 (S.D.N.Y. Apr. 16, 2004) ("Minute Maid has satisfactorily argued that they included the defense at the first practicable opportunity, when Sean Rice explained at his deposition that the contract could take longer than a year to perform."). Defendants also raised their Statute of Frauds defense in the Joint Pre-Trial Order, dated September 29, 2014 (see JPTO at 23), which left ample time for Plaintiff to argue against its application, which he did in a letter motion, dated October 1, 2014 (see Dkt # 119),

18

and in his post-trial Proposed Findings of Fact and Conclusions of Law. See Kroshnyi v. U.S. Pack Courier Servs., Inc., 771 F.3d 93, 109 (2d Cir. 2014) ("Because defendants raised the statute of frauds defense in their motion for summary judgment, plaintiffs had an adequate opportunity to argue against its application to this case.").

11. Plaintiff also fails to demonstrate any prejudice as a result of the Court's allowance of a Statute of Frauds defense. The Statute of Frauds defense "present[s] a pure question of law requiring no further factual development for its resolution, so that it could be, and was, fairly addressed by [Plaintiff] in [his Findings of Fact and Conclusions of Law." American Fed. Grp., 136 F.3d at 910; see also Marathon Enterprises, Inc. v. Schroter GMBH & Co., No. 01 Civ. 0595, 2003 WL 355238, at *5 (S.D.N.Y. Feb 18, 2003) (Chin, D.J.) ("Defendants' failure to specifically plead the . . . affirmative defense in their answers is not dispositive" because plaintiff "was put on notice of defendants' position" and "has not been prejudiced . . . ."). Accordingly, the Court concludes that Defendants' Statute of Frauds defense was not waived and Plaintiff's contract claims must be dismissed.

12. "If the plaintiff fails to prove a valid contract, the court may nonetheless allow recovery in quantum meruit to assure a just and equitable result." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (internal quotation marks omitted). "Applying New York law, we may analyze quantum meruit and unjust enrichment together as a single quasi contract claim." Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168, 175 (2d Cir. 2005). Plaintiff fails to establish such a claim by a preponderance of the evidence, as follows.

13. "To the extent that plaintiff seeks to recover the reasonable value of the services he rendered (i.e., in quantum meruit) . . . plaintiff must establish: '(1) the performance of the

19

services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services.'" Roistacher v. Bondi, 998 F. Supp. 2d 115, 122 (S.D.N.Y. 2014) (quoting Mid–Hudson, 418 F.3d at 175). **"For the most part, compensation under quantum meruit is based on an hourly rate for the amount of time services that are rendered."** Carlino v. Kaplan, 139 F. Supp. 2d 563, 565–66 (S.D.N.Y. 2001).

14. The Court finds that Plaintiff has failed to prove by a preponderance of the evidence the third and fourth elements of his quasi-contract claims, i.e., "an expectation of compensation" and the "reasonable value of the services" rendered by Plaintiff.[5] Plaintiff—who has sought a 15% commission for the Keller Williams deal amounting to $6,981,579.68—had no "reasonable expectation" that he would receive such a commission, given that the "definitive agreements hadn't been executed yet" (i.e., at the time of Plaintiff's alleged termination on April 5, 2013) and that the deal did not close until October 2013, some six months after his alleged termination. (Tr. 59:2–7; Mehra Decl. ¶ 56; SOUF ¶¶ 18–21; Findings of Fact, supra ¶¶ 22–24.) See International Paper Co. v. Suwyn, 978 F. Supp. 506, 513 (S.D.N.Y. 1997) ("Suwyn had no reasonable expectation of receiving his 1995 MIP bonus.").

15. And, Plaintiff offered no evidence regarding any "hourly rate" or "cost estimates." Roistacher v. Bondi, 998 F. Supp. 2d at 122; Rolleston-Daines v Estate of Hopiak, 263 A.D.2d 883, 885 (N.Y. App. Div. 1999). There is, therefore, no evidentiary basis upon which to determine the reasonable value of Plaintiff's services. See KJ Roberts & Co., Inc. v.

---

[5] With respect to both the first and second elements of a quantum meruit claim, while it is undisputed that Plaintiff rendered services for Think Tech, the parties dispute the significance of Plaintiff's services. (See Mehra Decl. ¶ 25 ("Plaintiff's involvement in the [Keller Williams Letter of Intent] was minimal and largely administrative."); id. ¶ 13 ("Plaintiff attended this meeting but did not have an active speaking role . . . .").)

MDC Partners, Inc., No. 14–953, 2015 WL 1262607, at *1 (2d Cir. March 20, 2015) ("[I]n the absence of any evidence to sustain Roberts's burden of proving the reasonable value of its services, the record taken as a whole could not lead a rational trier of fact to find for Roberts." (internal quotation marks omitted)); Evans-Freke v. Showcase Contr. Corp., 85 A.D.3d 961, 963 (N.Y. App. Div. 2011).

16.    And, Plaintiff may not rely upon the 15% commission mentioned by Mehra in the December 14, 2012 G-Chat to support his quasi-contract claims because "[u]nder New York law, a contract that is unenforceable under the Statute of Frauds is inadmissible as evidence of the reasonable value of services." Zaitsev v. Salomon Brothers, Inc., 60 F.3d 1001, 1004 (2d Cir. 1995).

17.    The FLSA and NYLL's wage and hour compensation provisions do not support Hershkowitz's claims because they apply only to "employees." Jimenez v. KLB Foods, Inc., No. 12 Civ. 6796, 2014 WL 2738533, at *2 (S.D.N.Y. June 17, 2014); 29 U.S.C. §§ 206(a) & 207(a)(1); NYLL § 562 ("Every employer shall pay to each of its employees for each hour worked a [minimum] wage . . . ."). Similarly, Plaintiff's claims under the commissions-payment and wage statement provisions of the NYLL, §§ 191(1)(c) & 195, apply only to "employees." See NYLL § 195 (Every employer shall . . . provide his or her employees . . . a notice containing the following information . . . .); id. § 190 ("commissioned salesperson" for the purposes of NYLL § 191 defined as "any employee whose principal activity is the selling of any goods, wares, merchandise, services . . . and whose earnings are based in whole or in part on commissions."). An independent contractor, such as Plaintiff, is not an employee and, therefore, is not entitled to the protections of the FLSA and NYLL relied upon by Plaintiff. See Preacely v. AAA Typing & Resume, Inc., No. 12 Civ. 1361, 2015 WL 1266852, at *11 (S.D.N.Y. Mar. 18,

2015) ("As this Court has determined that Preacely is an independent contractor for purposes of the FLSA, he does not have a valid claim against AAA for failure to display minimum wage requirements pursuant to the Act.").

18.    The Second Circuit applies an "economic reality test" to determine whether an individual is an employee or an independent contractor. Herman v. RSR Sec. Serv., 172 F.3d 132, 139 (2d Cir. 1999). The "ultimate concern is whether, as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988). The factors relevant to this inquiry include: "(1) the degree of control exercised by the employer over workers, (2) workers' own investment in a business and their opportunity for profit and loss, (3) the degree of skill and initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is integral to the employer's business. Brown v. New York City Dept. of Educ., 755 F.3d 154, 167 (2d Cir. 2014). "No one of the four factors standing alone is dispositive." Herman, 172 F.3d at 139. Rather, "employment for FLSA purposes [i]s a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." Barfield v. NYC Health & Hosps. Corp., 537 F.3d 132, 141–42 (2d Cir. 2008).

19.    The Court concludes that Plaintiff was not an "employee" of Think Tech, within the meaning of the FLSA and NYLL, at any point during the November 2012-April 2013 time period. Most of the relevant factors reviewed support the conclusion that Plaintiff was an independent contractor. With respect to the first factor, the Court finds that Mehra exercised minimal control over Hershkowitz. (See Findings of Fact, supra ¶ 8.) As noted, Mehra did not monitor or control Hershkowitz's schedule, nor did he mandate that Hershkowitz spend a certain

22

amount of time on Think Tech-related activities. (See Findings of Fact, supra ¶ 8; Herskowitz Decl. ¶ 23 ("I handled these demonstrations on my own, without Mehra's involvement."); Tr. at 141:20 –21 ("[Mehra]: [Hershkowitz] acted as an advisor to me. He said, trust me, I can help you out.").) See also Saleem v. Corporate Transp. Grp., Ltd., 52 F. Supp. 3d 526, 537 (S.D.N.Y. 2014) (where workers "decide for themselves when to provide ground transportation services"). In addition, Plaintiff was free to, and did, perform work for his own company, Square Foot Advisors, which was located in New York and was unrelated to Think Tech. (See Findings of Fact, supra ¶¶ 8–9.) See also Preacely, 2015 WL 1266852, at *7 ("[A] worker's ability to refuse assignments assigned by the supervisor, to work from a location other than the employer's office, to determine his own hours, and to hire and fire his own assistants all support a finding of independent contractor status.").

20. With respect to the second factor, Plaintiff had an "opportunity to profit" from his relationship with Think Tech because he was working with the expectation of obtaining commissions for deals he "closed." (See Findings of Fact, supra ¶ 11; Pl. Ex. 37 ("[PLAINTIFF]: I love incentives . . . I want to make us both a few mil[lion]").) See Schwind v. EW & Assocs., Inc., 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) (where "plaintiff had an opportunity for profit because he worked on commission"); Spiteri v. Russo, No. 12–CV–2780, 2013 WL 4806960, at *59 (E.D.N.Y. Sept. 7, 2013) ("[A]t least a portion of Plaintiff's compensation was contingent on his investment in the business, since according to Plaintiff, the . . . Defendants agreed to pay him a ten percent commission . . . ."); Evans v. MassMutual Fin. Grp., 856 F. Supp. 2d 606, 610 (W.D.N.Y. 2012) ("The fact that plaintiff received commissions rather than a salary, for example, tends to indicate that he may have been an independent contractor . . . .").

23

21.     With respect to the third factor, the Court finds that the work performed by Plaintiff on behalf of Think Tech required a "significant degree of skill," such as Plaintiff's real estate experience and his ability to "talk the talk" with prospective deal partners. (Pl. Ex. 69 (Email from V. Mehra to J. Tang, dated May 7, 2013).) See Preaceley, 2015 WL 1266852 at *9 ("Where a job requires a significant degree of skill . . . or the use of skill in an independent way . . . courts have found workers are independent contractors." (internal quotation marks and citations omitted)).

22.     With respect to the fourth factor, the relationship between Plaintiff and Think Tech was of a relatively short duration, i.e., from November 2012 until April 2013. Id. (where plaintiff "worked for AAA intermittently for fifteen months, from December 2007 until March 2009, doing piecemeal work on an ad hoc basis . . . ."). Moreover, Plaintiff was under no contractual obligation to continue working for Think Tech. See Saleem, 52 F. Supp. 3d at 542 ("[D]rivers could terminate the agreements at will, a fact that courts have found favors a finding of independent contractor status.").

23.     With respect to the fifth factor, the Court finds that Hershkowitz's work during the November 2012-April 2013 time period was important to Think Tech's business but "this factor only weighs slightly in favor of finding that the Plaintiffs should qualify as employees under the FLSA, and would not prevent this Court from finding, as a matter of law, that the Plaintiffs are independent contractors." Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590, 610 (E.D.N.Y. 2012).

24.     Given all the evidence which supports the above factors, (see Findings of Fact, supra ¶¶ 8–13), and having considered the "totality of the circumstances," the Court concludes by a preponderance of the evidence that Plaintiff was not an employee of Defendants. "[A]s a

24

matter of economic reality," Plaintiff did not depend upon Think Tech for the opportunity to render his services. Brock, 840 F.2d at 1059. He owned his own company, Square Foot Advisors, throughout this period and simultaneously undertook (without contractual guarantees) to work alongside Mehra in the hopes of obtaining commissions from Think Tech-related deals,. (See Findings of Fact, supra ¶¶ 8–9.) Plaintiff was clearly "in business for [himself]," and accordingly was not an employee for FLSA purposes. See Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 171 (2d Cir. 1998) (where worker "was not required to spend time in the company's offices; was free to set his own schedule and take vacations when he wished; did not have the company withhold income or Social Security taxes; did not receive employee benefits such as health insurance . . . [and] was allowed to sell merchandise on behalf of other companies . . . .").

     25.     For the same reasons cited at paragraphs 19–23 above, the Court concludes by a preponderance of the evidence that Plaintiff was not an "employee" under the New York Labor Law. In determining whether a worker is an employee or independent contractor under the NYLL, courts consider factors similar to those used in the FLSA inquiry, namely, "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." Saleem, 52 F. Supp. 3d at 536 (quoting Bynog v. Cipriani Group, Inc., 1 N.Y.3d 193, 198 (2003)). As noted, Hershkowitz owned and operated his own company, Square Foot Advisors, while he also sought to earn commissions from Think Tech. He worked out of his own company's office space and according to his own schedule; he was free to and did engage in non-Think Tech employment; did not receive employment benefits from Think Tech; was never on Think Tech's payroll; and was not on a fixed schedule. (See Findings of Fact, supra ¶¶ 8–13.)

26. Even assuming, arguendo, that Plaintiff could qualify as an "employee" under the FLSA and NYLL, his statutory claims would fail because the FLSA and the NYLL exempt "outside salesmen." See 29 U.S.C. § 213(a)(1); NYLL § 651(5)(d). An "outside salesman" is defined as an individual whose "primary duty" is "making sales . . . or obtaining orders or contracts for services" and who is "customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500; see Gold v. N.Y. Life Ins. Co., 730 F.3d 137, 145–46 (2d Cir. 2013). The evidence in this case demonstrates that (1) Plaintiff's primary duty vis-à-vis Think Tech was "obtaining orders or contracts for [Think Tech's] services," i.e., closing licensing deals; and (2) Plaintiff regularly worked at his own company's (Square Foot Advisors) offices and away from Think Tech's Texas offices and for his own Square Foot Advisors clients. See Gorey v. Manheim Services Corp., 788 F. Supp. 2d 200, 206 (S.D.N.Y. 2011).

27. For the reasons stated in paragraphs 17–26, the Court concludes that Plaintiff has failed to prove by a preponderance of the evidence that Defendants violated the FLSA and NYLL.

## Defendants' Counterclaim

28. To prevail on their counterclaim for tortious interference with prospective business relations under New York law, Defendants would have to prove that (1) they maintained business relations with a third party, (2) Plaintiff interfered with those business relations, (3) Plaintiff acted with the sole purpose of harming Defendants or used dishonest, unfair or improper means, and (4) damages to that business relationship resulted from Plaintiff's actions. Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000).

29. The Court concludes that Defendants have failed to prove by a preponderance of the evidence the second, third and fourth elements of their tortious interference counterclaim. The letters sent by Plaintiff's attorney, Mr. Piesco, in early May 2013 to six of Think Tech's clients mention the grounds for Plaintiff's anticipated lawsuit against Defendants (i.e., "failure to pay commissions, wages, and/or other remuneration to which [Hershkowitz is] entitled"). According to Plaintiff, they do so in the context of requesting the retention of records by entities related to this dispute. (See Def. Exs. 43–48.) Defendants have not proven by a preponderance of the evidence that Mr. Piesco's letters were motivated solely by the purpose of harming Defendants. See Bon Temps Agency Ltd. v. Greenfield, 184 A.D.2d 280, 282 (N.Y. App. Div. 1992) (where "sending of the letter by counsel for the plaintiff was not actionable, as it was done in good faith to insist upon what were believed to be the plaintiff's legal rights"). Similarly, the Court concludes that Defendants have not shown that Plaintiff's post-April 5, 2013 call to Jason Tang was motivated by an intent to harm Defendants. (See Tr. at 80:5–7 ("Q: Was it your intent in calling Mr. Tang to in any way to disrupt the Keller Williams deal? [Plaintiff]: Not at all.").)

30. Defendants have also failed to prove that Mr. Piesco's letters and Plaintiff's call to Mr. Tang were the "proximate cause" of any damages. Pacheco v. United Medical Associates, P.C., 305 A.D.2d 711, 712 (N.Y. App. Div. 2003). Defendants' contention that the letters and phone call "caus[ed] [Think Tech] to (i) lose business it otherwise would have gained, and (ii) make concessions to close new deals or retain existing contracts," (Defs. FFCL at 28), is speculative. See American Preferred Prescription, Inc. v. Health Management, Inc., 252 A.D.2d 414, 419 (N.Y. App. Div. 1998) ("Since plaintiff's claim for damages is entirely speculative, the cause of action for tortious interference with prospective business relations should be dismissed."). (See Tr. 184:15–17 (Q: You don't allege anywhere in your declaration that you

suffered any monetary damages as a result of that, correct? [Mehra]: . . . I don't think we put a

number to it.").)

## IV.    Conclusion & Order

For the foregoing reasons, the Clerk of the Court is respectfully requested to enter

judgment in favor of Defendants and against Plaintiff. The Clerk of the Court is further directed

to close this case.

Dated: New York, New York
      June 19, 2015

**RICHARD M. BERMAN, U.S.D.J.**